UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60103-CIV-JORDAN
MAGISTRATE JUDGE P.A. WHITE

DENNIS V. BAKER,                    :

          Plaintiff,               :          <u>REPORT OF</u>
                                              <u>MAGISTRATE JUDGE</u>
v.                                 :

DEPUTY JEFFREY COHEN, et al., :

          Defendants.              :
_____

## I   INTRODUCTION

Plaintiff Dennis V. Baker, a Florida prisoner now confined at Century C.I., filed a <u>pro se</u> civil rights complaint pursuant to 42 U.S.C. §1983 for damages, raising claims of excessive force, and failure to intervene, arising from events surrounding his arrest on February 7, 2007. After a Preliminary Report and Order of partial dismissal (DE#s 7 and 21) the case remains pending against three defendants: Deputy Cohen, Deputy Sprouse, and Lt. Cedeno, all employees of the Broward Sheriff's Office ("BSO").[1]

**This Cause is before the Court upon a joint motion for summary judgment by defendants Cohen, Cedeno and Sprouse (DE#35)** with supporting exhibits (Exs. A-H, at DE# 35-1), as to which plaintiff Baker was advised of his right to respond (<u>see</u> Order of Instructions DE#37.[2] Plaintiff Baker filed an unsworn Response (DE#38,

_____

[1]   For reasons discussed in the Preliminary Report (DE#7), Medical claims against a physician, Dr. Carralero, at the Broward General Medical Center were dismissed (DE#21).

[2]   Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to

pp.1-24) with exhibits (DE#38, pp.25-75); and the defendants filed
a Reply (DE# 41).

---

> establish the existence of an element essential to that
> party's case, and on which that party will bear the
> burden of proof at trial.  In such a situation, there
> can be 'no genuine issue as to any material fact,' since
> a complete failure of proof concerning an essential
> element of the non-moving party's case necessarily ren-
> ders all other facts immaterial. The moving party is
> 'entitled to judgment as a matter of law' because the
> non-moving party has failed to make a sufficient showing
> on an essential element of her case with respect to
> which she has the burden of proof.  (citations omitted)

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that
summary judgment should be entered only against a party who fails to make a
showing sufficient to establish the existence of an element essential to that
party's case, and on which that party will bear the burden of proof at trial.
In such a situation, there can be 'no genuine issue as to any material fact,'
since a complete failure of proof concerning an essential element of the non-
moving party's case necessarily renders all other facts immaterial.  The moving
party is 'entitled to judgment as a matter of law' because the non-moving party
has failed to make a sufficient showing on an essential element of her case with
respect to which she has the burden of proof. (citations omitted). Thus, pursuant
to Celotex and its progeny, a movant for summary judgment bears the initial
responsibility of informing the court of the basis for his motion by identifying
those parts of the record that demonstrate the nonexistence of a genuine issue
of material fact. This demonstration need not be accompanied by affidavits.
Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir. 1990). If the party seeking
summary judgment meets the initial burden of demonstrating the absence of a
genuine issue of material fact, the burden then shifts to the nonmoving party,
to come forward with sufficient evidence to rebut this showing with affidavits
or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577
(11 Cir.), cert. denied, 112 S.Ct. 913 (1992).  It is the nonmoving party's
burden to come forward with evidence on each essential element of his claim
sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907
F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his
complaint and other initial pleadings to contest a motion for summary judgment
supported by evidentiary material, but must respond with affidavits, depositions,
or otherwise to show that there are material issues of fact which require a trial
Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir. 1987). If the
evidence presented by the nonmoving party is merely colorable, or is not signi-
ficantly probative, summary judgment may be granted. Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971
F.2d 1558 (11 Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing
party's position will not suffice; there must be enough of a showing that the
jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577
(11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), the Order of
Instructions (DE#37) was entered, informing the pro se plaintiff Baker of his
right to oppose the defendants' joint motion for summary judgment (DE#35), and
instructing him regarding requirements under Fed.R.Civ.P. 56 for a proper
response to such a motion.

2

The Defendants' Exhibits, filed at DE#35-1, consist of:

Ex.A        A records Request for records pertaining to Baker's underlying State Criminal Case.

Ex.B:       Excerpts from Jeffrey Cohen's 5/3/07 Deposition; with Cohen's attached Police Report and Probable Cause Affidavit, both dated 2/7/07.

Ex.C:       A complete transcript of a sworn statement given to BSO Detective Schroeder, between 9:30 and 10:00 a.m. on 2/7/07, by Jennifer (Jen) Craig, concerning events involving her and Dennis Baker that occurred earlier that morning while she was a passenger in Baker's truck.

Ex.D:       Excerpts from Lt. Cedeno's 5/3/07 Deposition; with Cedeno's attached Police Report dated 2/7/07.

Ex.E:       Excerpts from Sgt. Katz's 5/3/07 Deposition.

Ex.F:       Deputy Sprouse's 2/7/07 BSO Canine Incident Report.

Ex.G:       Excerpts from Deputy Sprouse's 5/3/07 Deposition; with attached Police Report dated 2/7/07.

Ex.H:       BSO Miranda Warning form, dated 2/7/07, signed by Dennis Baker, regarding warnings given by Det. Schroeder.

(Defendants' Exhibits, DE#35-1, at pp. 1-91).


Plaintiff's Exhibits, filed with his Response (DE#38), include excerpts of transcripts from testimony given:

at trial by Peggy Hernandez [a Walgreens employee who initially called the police on 2/7/07 to report a theft of cigarettes];

at deposition and at trial by Deputy Cohen, with a copy of Cohen's 2/7/07 Probable Cause Affidavit attached;

at deposition and at trial by Lt. Cedeno;

<u>at deposition</u> and <u>at trial</u> by Sgt. Katz;

<u>at deposition</u> by Deputy Sprouse;

<u>at trial</u> by Detective Schroeder; and

<u>at trial</u> by plaintiff Baker.

(Plaintiff's Exhibits, DE#38 at pp. 25-75).

## <u>Plaintiff's Allegations/Claims</u>

The Plaintiff Baker's statements and allegations in his complaint (DE#1) are essentially, as follow.

Baker first encountered Deputy Cohen when the officer stopped him "for driving on the wrong side of the road," after he left a Walgreens store. Baker and Deputy Cohen exited their vehicles at the same time, and Cohen asked him for identification. (DE#1, p.4).

<u>Baker's first claim</u> is that Cohen then used force against him after he had begun looking for the requested documents. Baker walked around the front of his truck to first search in the glove compartment; and then, not wanting to reach over his female passenger, Baker walked back around his truck toward the driver's side so he could access the center console. As Baker returned to the driver's side a backup officer arrived and began to approach the passenger side of his truck; and Baker states that, as he sat in the driver's seat, a BOLO on the police radio announced that a misdemeanor theft had just occurred "at the Walgreens Deputy Cohen seen me exit." At this point in time Deputy Cohen's use of force began. Baker describes it as follows. "Deputy Cohen grabs be around my neck and left wrisk [sic] as I set in my truck and snatched me to the ground and started beating me and taising me twice." [Baker states that after the first use of the taser he broke free, ran for his truck, and got in the seat. Cohen then tased him again, and he (Baker)

4

fell out of the truck, breaking contact with the taser, and he
(Baker) then got back in the truck as a backup deputy was pointing
a gun at him]. Baker states that he put his truck in gear and fled
because he felt "threaten for my life." He states that Cohen and
the backup officer did not give chase, and instead remained at the
scene of the initial encounter where his passenger [a prostitute]
also remained. Baker states that the backup officer was Lt. Cedeno,
Deputy Cohen's supervisor. (DE#1, p.4)

Baker's second claim is that, at the scene where his truck
initially was stopped, Cedeno should have intervened to prevent
Cohen's use of force, but he instead stood by, preoccupied with his
(Baker's) passenger, and did nothing to stop Cohen. (DE#1, p.5).

Baker states he then drove away ("fleeing out of necessity"),
and in doing so had an accident ("I eventually rolled my truck").
He states that he then was afraid, and fled on foot ("searching for
safety"). He states that he hid in an unlocked car, lying on the
floor-board, tired, frightened and injured. Thereafter, events
giving rise to Baker's third claim occurred. (Id.)

Baker's third claim is that K-9 Deputy Sprouse and Deputy
Cohen located him [in the car in which he was hiding], and "without
any warning"..."opened the door and let the police dog maul me
until paramedics appeared." Baker alleges that he "received more
than 50 dog bite [sic] with some lacerations very deep, long and
wide, scars I'll carry for life." (DE#1, p.5).

In the last section of his complaint, labeled "Conclusion"
(DE#1, p.6), Baker states as follows:

> I was charged with petit theft that was dropped in Magistrate
> Court later amended. I was charged with driving on the wrong
> side of the road which was dismissed, both misdemeanors but
> because of the excessive force I was receiving I fled

receiving Aggravated Fleeing, Battery on a Police which I was acquitted, and resisting arrest with violence which the jury found me guilty of a lesser offense of resisting without violence. I received 15 years for the fleeing. Im currently receiving treatment stemming from the incidents mentioned in the this suit which consist of: see below

1. An injured neck, the third, fifth cervix [sic]

2. An injury to my spinal column, the T-12

3. A dislocated left shoulder

4. Extensive heart problems suffered from having a heart attack during this incident.

5. And a contusion (massive)

6. multiple dog bites

### A.   Law Relating to Claims of Excessive Force, and Qualified Immunity

### 1.   Use of Force, and Failure to Intervene, In General

A claim that a law enforcement officer used excessive force in the course of an arrest, an investigatory stop, or any other seizure of a free citizen is to be analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386 (1989); Vinyard v. Wilson, 311 F.3d 1340, 1346-47 (11 Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1197 (11 Cir. 2002); Ortega v. Schram, 922 F.2d 684, 694 (11 Cir. 1991).

Such an analysis requires a court to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interest alleged to justify the intrusion." Graham, supra, quoting United States v. Place, 462 U.S. 696 (1983). The factors to consider when balancing an arrestee's constitutional rights and the need for use of force include (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or

others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; Graham, supra, 490 U.S. at 396; Vinyard, supra, 311 F.3d at 1347; Lee, supra, 284 F.3d at 1197; and in determining whether the force applied was "reasonable" under the circumstances, the Court must examine: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; and (3) the extent of the injury inflicted upon the individual to whom the force was applied. Graham, at 396; Vinyard, at 1347; Lee at 1998.[3] In this respect, however, regardless of the severity of the alleged offense, every officer may use some force in carrying out a custodial arrest. See Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir.2003). See Graham v. Connor, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). Indeed, "the typical arrest involves some force and injury." Rodriquez v. Farrell, 280 F.3d 1341, 1351 (11th Cir.2002) (quoting Graham, supra, 490 U.S. at 396). Therefore, "[i]t is well established in this [the Eleventh] Circuit that where an arrest is supported by probable cause, the application of de minimis force as needed to effect the arrest, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Williams v. Sirmons, No. 08-13218, 2009 WL 80264, at *5-6, 307 Fed.Appx. 354, 360 (11th Cir. 2009)(citing Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir.2000)).

---

[3]      Although the test applied by the Eleventh Circuit previously included a subjective prong, examining whether the force was applies maliciously, see e.g. Leslie v. Ingraham, 786 F.2d 1533, 1536 (11 Cir. 1986), that factor was eliminated from the analysis by Graham and other cases establishing that the excessive force inquiry should be completely objective, thereby excluding consideration of the Officer's intentions. Lee, supra, 284 F.3d at 1198 n.7. Thus, "reasonableness" for purposes of such an analysis is judged according to an objective standard under the totality of the circumstances, without regard to the officers' underlying intent. Graham, supra at 389.

Just as a claim of excessive force by an arresting officer is cognizable under 42 U.S.C. §1983, so too is a claim that an officer who himself did not use force, but was present, failed to intervene to prevent unconstitutional force by a fellow officer, if circumstances were such that intervention was possible. See Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11 Cir. 1985).

It is also a fundamental principle that for §1983 liability to be imposed, the plaintiff must establish proof of an affirmative causal connection between a particular person acting under color of state law and the constitutional deprivation alleged. LaMarca v. Turner, 995 F.2d 1526, 1538 (11 Cir. 1993); Williams v. Bennett, 689 F.2d 1370, (11 Cir. 1982)(citing Monell v. Dept. of Social Servs., 436 U.S. 658, 692 (1978)).

### K-9 Force

The practice of police departments authorizing officers to use trained police dogs to find, seize and hold suspects, by biting if necessary, has been upheld by the courts. See: Kerr v. City of West Palm Beach, 875 F.2d 1546 (11 Cir. 1989); Chew v. Gates, 744 F.Supp. 952 (C.D.Cal. 1990). However, whether a particular use of force is a sufficient intrusion, so as to violate a suspect's Fourth Amendment rights, is subject to analysis under Graham v. Connor, supra.

### Taser Force

Regarding the use of a taser, the Eleventh Circuit, while noting that "being struck by a taser gun is an unpleasant experience," nonetheless held in Draper v. Reynolds, 369 F.3d 1270, 1278 (11 Cir. 2004) that, based on the facts of that case, "a single use of the taser gun causing a one-time shocking was reasonably proportionate to the need for force and did not inflict any serious injury." The Court in reaching its holding noted that the §1983 plaintiff/arrestee Draper had been encountered during a traffic stop, had no less than 5 times refused to retrieve documents from

8

his truck cab, was using profanity, "moved around and paced in agitation," and repeatedly yelled at officer Reynolds before Reynolds struck him with the taser. The Court noted that "under these circumstances the single use of the taser gun may well have prevented a physical struggle and serious harm to either [the arrestee or the officer]." By contrast, cases have suggested that taser use may, upon a different set of facts, constitute excessive force.[4]

## 2.  Qualified Immunity

Under appropriate circumstances, qualified immunity insulates governmental officials from the burdens of civil trials and from personal liability for actions taken pursuant to their discretionary authority. Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Flores v. Satz, 137 F.3d 1275 (11 Cir. 1998); Foy v. Holston, 94 F.3d 1528 (11 Cir. 1996). Once the qualified immunity defense is raised by a defendant, the plaintiff

---

[4]     A 2007 district court opinion from the Southern District of Alabama, Stephens v. City of Butler, Alabama, 509 F.Supp.2d 1098, 1112-13 (S.D.Ala., 2008), citing Draper, found based on the facts and circumstances in the arrestee Stephens' case (which included 5 taser "trigger pulls" by two different officers, where the arrestee was making no effort to escape, was surrounded by officers, and made no movement that would be deemed an attack upon or threat to officers), that the use of force was "objectively unreasonable and excessive," and that a reasonable inference could be made that the second officer who used his taser after a first officer had already shocked Stephens several times "simply 'piled on.'"  The events in the Stephens case took place in September 2004, and the district court found that the state of the law in the Eleventh Circuit, including the opinion in Vinyard v. Wilson, 311, 1340 (11 Cir. 2002) which involved the spraying of a detainee multiple times with pepper spray while in custody and not posing a threat to the officers, gave law enforcement officers fair warning that repeated use of force on a non-violent arrestee may be deemed excessive and a violation of the Fourth Amendment. As noted in the Alabama district court opinion in Stephens, which involved tasers, the Eleventh Circuit in 2002 in Vinyard made it clear that under certain circumstances, even when the peculiar facts of a case faced by an officer who has used force are not exactly on point with prior precedent [e.g. that Vinyard involved pepper spray, not tasers], the prior precedent, involving a different mode of force or set of facts is still sufficient to put the officer on notice that his use of force is unconstitutional. Stephens, supra, 509 F.Supp.2d at 1112-13. See Vinyard, supra, 311 F.3d at 1355 (holding that the defendant officer was not entitled to qualified immunity, because "[t]he peculiar facts of this case are 'so far beyond the hazy border between excessive and acceptable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point,'"(quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11 Cir. 2000)).

bears the burden of showing that the federal rights allegedly violated were clearly established. <u>Foy</u>, <u>supra</u>, at 1532.[5]   When faced with a question of qualified immunity, the Courts pursuant to <u>Saucier v. Katz</u>, <u>supra</u>, 533 U.S. at 199-200, overruled in part by <u>Pearson v. Callahan</u>, 129 S.Ct. 808 (2009), have until recently en-gaged in a two-step analysis: first asking [taking the facts in the light most favorable to the plaintiff/non-movant] whether the offi-cial's alleged conduct violated the plaintiff's constitutional rights, and then proceeding, if necessary, to a second question, whether the right was clearly established at the time of the con-duct. (Note: After the Supreme Court's opinion in <u>Pearson v.</u>

---

[5]   The test for courts to use in determining whether an official is pro-tected by qualified immunity is whether the official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419 (11 Cir. 1997) (quoting <u>Harlow v. Fitzgerald</u>, <u>supra</u>, 457 U.S. at 818)). The Court of Appeals for the Eleventh Circuit has held that in this Circuit the law can be "clearly established" for qualified immunity purposes, "only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." <u>Jenkins v. Talladega City Bd. of Education</u>, 115 F.3d 821, 826-27 n. 4 (11 Cir. 1997)(en banc).

In the Fourth Amendment context, the Supreme Court in <u>Graham v. Connor</u>, 490 U.S. 386 (1989) did not stake out a bright line for identifying force as excessive, and rather enunciated a multi-factor test for the courts to apply to facts of each case. Where a reasonable official is aware of the existence of an "abstract right" such as "a right to be free from excessive force," it does not necessarily "equate to knowledge that his conduct infringes the right," <u>Smith</u>, <u>supra</u>, 127 F.3d at 1419; and it is almost always true, where "case law, in factual terms, has not staked out a bright line," that qualified immunity pro-tects the defendant. <u>Smith</u>, <u>supra</u> at 1419 (quoting <u>Kelley v. Curtis</u>, 21 F.3d 1544, 1550 (11 Cir. 1994) and <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552, 1557 (11 Cir. 1997)).

Thus, for a plaintiff to overcome a defendant officer's assertion of enti-tlement to qualified immunity, he usually must cite to a factually similar case or cases which would have put the defendant actor on notice that his conduct would, under the circumstances, be unconstitutional. Alternatively, the Eleventh Circuit has held that where a plaintiff who was subjected to force by an officer has not cited (and the reviewing court has not located) such a factually similar case, then the plaintiff may overcome qualified immunity by showing that the con-duct alleged "lies so obviously at the very core of what the Fourth Amendment prohibits," i.e, that it "was so far beyond the hazy border between excessive and acceptable force" that the officer "had to know he was violating the Constitution even without caselaw on point." <u>Smith</u>, <u>supra</u>, 127 F.3d at 1419. This kind of case, presenting an exception to a defendant's entitlement to qualified immunity, where no factually similar (bright line) precedent has been cited or found, has been termed by the courts as an "obvious clarity" case. <u>See</u> <u>Jenkins</u>, <u>supra</u>, 115 F.3d at 825 (citing <u>United States v. Lanier</u>, 520 U.S. 259, 117 S.Ct. 1219, 1227 (1997)); <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1350 (11 Cir. 2002).

Callahan, 129 S.Ct. 808 (2009), the Saucier two-step analysis is no longer an inflexible progression. Post-Pearson, the courts are now free to answer the second step first).  If a court, addressing the questions in the order set out in Saucier, first determines that no constitutional violation occurred, the inquiry ends there. If, however, the alleged conduct amounts to a constitutional violation, the Court then must ask whether the right was clearly established at the time of the conduct.

## II  DISCUSSION

### A.  The Record

The sequence of events described briefly in Baker's §1983 complaint is essentially the same as that which is described in evidentiary documents of record, attached to the defendants' motion for summary judgment and Baker's Response. That statement of facts in Baker's complaint, however, is highly abbreviated, and omits many pertinent details [established by the defendants' exhibits], which are consistent with the sequence of events set out by plaintiff Baker, but at the same time shed additional light upon the events which occurred and shed light upon the bases for the defendants' actions about which the plaintiff now complains.

As noted supra, the body of Baker's Response is itself an unsworn document. Baker's Response opposing the defendants' motion for summary judgment therefore does not itself suffice as competent evidence of the type contemplated by Fed.R.Civ.P. 56, needed to rebut evidentiary showings by the defendants/movants, so as to create genuine issues of material fact. (See footnote 1, supra). The only documents submitted by the plaintiff which could serve for that purpose are Baker's complaint itself, which was filed under penalty of perjury (DE#1),[6] and Baker's exhibits, listed supra,

---

[6]    See Perry v. Thompson, 786 F.2d 1093, 1095 (11 Cir. 1986) (holding that facts alleged by the plaintiff in a sworn pleading are sufficient to defeat a motion for summary judgment, and it is improper to grant summary judgment on the basis of credibility choices); Sammons v. Taylor, 967 F.2d 1533, 1544-45 &

consisting of excerpts of transcripts of testimony by: the Walgreen's Clerk Peggy Hernandez; by Officers Cohen, Cedeno, Katz, Sprouse, and Schroeder; and by plaintiff Baker himself.

## 1.  **Cohen's Uses of Force at the Scene of the Traffic Stop**

It is undisputed that during a progression of events Deputy Cohen used force against plaintiff Baker several times, all after Lt. Cedeno had arrived at the scene where Baker's truck was stopped near the Walgreens store. As indicated in Baker's complaint, the record shows that these uses of force consisted of pulling Baker from the truck and taking him to the ground; striking Baker during an altercation with him on the ground; and shocking Baker twice with a Taser [Electronic Control Device], once after Baker had gotten back in the truck and was seated in it -- causing him to dive or fall to the ground, and thereafter a second time when Baker was on the ground, before he got back into his truck the final time and fled from the scene leading officers on a high speed chase.

The plaintiff's Complaint, and the aforementioned Exhibits of record, including police reports; a sworn statement from the prostitute/passenger in Baker's truck at the scene of the initial stop; a police probable cause affidavit; and excerpts of deposition and trial testimony given by officers and the Walgreens store employee, show the following.

The prostitute Craig's sworn statement and Deputy Cohen's probable cause affidavit shed light on events that occurred before

---

n.5 (11 Cir.1992) (holding that the "facts alleged in an inmate's sworn pleading are sufficient" to defeat as motion for summary judgment and "a separate affidavit is not necessary," so long as the allegations are not conclusory in nature). <u>Cf</u>. 28 U.S.C. §1746, which provides an alternative to making a sworn statement, by allowing the individual to say that his/her statement is true under penalty of perjury.

the initial stop of Baker's vehicle by Cohen, and the start of his
encounter(s) with the police.

### The Walgreens Incident, and
### Initial Stop of Craig's Vehicle

In his complaint, Baker states that on 2/7/07 Deputy Cohen
stopped him for "driving on the wrong side of the road," and that
after Cohen activated his emergency lights, he [Baker] pulled into
a parking lot and got out of his truck at the same time that Cohen
got out of his police car.

The record shows that Baker and the prostitute Ms. Craig had
driven to a Walgreens store; and that Baker went in, and minutes
later came out running and screaming. (Craig Statement, p.3). A
lady from the store was chasing Baker. He threw several cartons of
cigarettes into his vehicle and they hit Ms. Craig. (Id., p.3).
Baker drove out of the parking lot onto "Atlantic" [Boulevard],
made another maneuver like he was going to "turn around or
something," but "the brakes completely gave out" and he "swerved
into oncoming traffic." (Id., p.3). [As further explained by Ms.
Craig, after Baker's brakes failed to stop him, and he ended facing
on-coming traffic, he then started backing up and a police car that
was behind him turned on its lights. (Id., pp.4-5)].

The reason for the initial stop is reflected in Cohen's sworn
Probable Cause Affidavit (at DE#35-1, Ex.B). Cohen saw the truck
leave the Walgreens property and pull onto Atlantic Boulevard.
(Id.). It appeared to Cohen that the driver attempted a left turn
into a shopping plaza, but the vehicle instead continued westbound
and came to rest in an eastbound lane about 20 yards past where the
turn [shopping plaza entrance] would have been. The driver then
backed up and turned into the shopping plaza. At that point in
time, Cohen, having activated his overhead lights, made the traffic
stop. (Id.). In his deposition testimony (also at Ex.B), Deputy
Cohen explained he first noticed the driver because he was driving

slow, had swerved, crossing the line between two lanes, and had pulled into a turning lane which was for use to turn into a shopping center on the south side of Atlantic Boulevard. (T/5-7). The driver, however, passed the driveway to the shopping center. Having not turned, he continued forward in the lane he was in, which then became a lane for opposing traffic (T/7-8). He went about 10 or 20 yards past the end of the turn lane onto pavement that would have oncoming traffic if there had been any eastbound vehicles, and he then backed up, and turned into the shopping center entrance that he had just passed. (T/8).

It is undisputed that both Deputy Cohen and plaintiff Baker got out of their vehicles at the same time.

Cohen asked Baker for his licence, registration, and proof of insurance. (Ex.B, Cohen's PC Affid.; Complaint). To Cohen, Baker appeared nervous and he did not produce any of the requested items. (Ex.B, PC Affid). Ms. Craig also stated under oath that when Baker jumped out of his truck he was asked for the documents, but did not produce any. (Ex.C, Craig Statement, pp.5-7). Cohen testified at deposition that after Baker got out of the truck and was asked for ID, he went to the passenger side to look in the glove box. (Ex.B, T/11). It was at that point that Officer Cedeno arrived as Cohen's backup. (Id.). After Officer Cedeno approached the passenger side of Baker's truck, Baker walked around the front of the vehicle toward the front left fender. (Id., T/12). Just as Baker stated in his complaint, Ms. Craig said Baker first went to the passenger side to look for papers, and then walked over to the driver's side of the vehicle. (Ex.C, Id., p.6). Ms. Craig stated that it was when Baker walked around to driver's side of the truck that the BOLO came over the police radio, announcing, according to her, that there was a robbery on Atlantic by a black male in a black truck (Id., pp. 5, 6). The Walgreens employee Ms. Hernandez testified at trial that she went outside the store while talking to the police

14

dispatcher, and relayed information which included a description of the truck, and its license tag number. At trial she testified that she could not then recall the tag number, but that on the day of the theft she had given the dispatcher the tag number. She was outside the store when she relayed the information to the police, as she watched the man leave the parking lot and pull away. (Hernandez, T/238-239).

Baker in his Complaint states that while he was looking for identification, and had walked from the passenger side of the vehicle to the driver's side, the "broadcast was airred [sic] pertaining to a theft (petit) misdemeanor occurring at the Walgreens Deputy Cohen seen me exit."

At his deposition, Deputy Cohen testified that when the BOLO was broadcast it first referenced an assault, but then referenced a theft at Walgreens, without specific details about what had happened there. (Ex.B, T/12-13). The dispatcher broadcast the number of the license plate. (Id., T/14).[7] Deputy Cohen testified that when he heard the BOLO, he could tell that Baker heard it too, because "his eyeballs basically bugged out of his head." (T/13). He (Cohen) told Baker to come over to where he was standing. (Ex.B, T/13). Deputy Cohen testified that he did not know for sure, but he had a strong suspicion that it was Baker who had committed the offense referenced in the BOLO. (T/14).

---

[7]     There is evidence indicating there is some discrepancy regarding the reported color of the truck that fled from the Walgreens store. The prostitute/passenger Ms. Craig in her statement said the BOLO referred to a Black male in a black truck. (Ex.C at p.6). The Walgreens employee later, at trial, made reference to a "gold colored, goldish tan colored" truck. (DE#38, T/238). In light of the facts that the store clerk also had described the suspect as Black male, and gave police the license tag, which was broadcast in the BOLO [a tag number that matched the plate on Baker's truck], and that Deputy Cohen saw that the truck which he stopped had pulled out of the Walgreens parking lot, any apparent discrepancy about color of the truck does not appear sufficient to create an issue of material fact.

Deputy Cohen tried to detain Baker, but Baker very quickly got back in the driver's seat of his truck, and Deputy Cohen perceived that he was attempting to drive away. (Ex.B, Cohen PC Affid). Officer Cedeno at deposition testified that Baker reacted when the dispatch came over the radio, and entered his vehicle and got behind the wheel. (Ex.D, T/7-8). At that point, Cohen physically pulled Baker from his vehicle, grabbing him by the left arm and around the neck (Ex.B, Cohen Depo. T/13-14; Ex.B, Cohen PC Affid). Baker resisted, punching and flailing his arms at Cohen as Cohen was attempting to handcuff Baker, the scuffle continued and the two men ended up on the ground. (Ex.B, Cohen PC Affid). At deposition, Cohen testified that Baker punched him in the face, and body, and that he (Cohen) punched Baker back in the face and the body (Depo. T/17, at DE#38, p.34). Both men returned to their feet, Baker rushed Cohen and got him in a bear hug, and Cohen could feel Baker's hand tugging at his [Cohen's] firearm. Cohen testified, however, that because Baker was also squeezing against his arm, it would have been difficult for Baker to remove the gun from his holster. (Ex.B, Cohen Depo. T/20-21; Ex.B Cohen PC Affid). Cohen was able to turn, and push Baker away from him; this propelled Baker toward the open driver's door of his truck, and Baker got in the driver's seat. When Baker got in he turned the ignition and started the engine. This, Deputy Cohen perceived as an attempt by Baker to Flee. (Ex.B, Cohen Depo. T/23; Ex.B Cohen PC Affid; Cohen at Trial T/261-262, DE#38 pp.43-44). At that point, while the vehicle's engine was running, Cohen deployed his taser and fired it at Baker; and after a 5-second Taser charge Baker said, "OK, I give, I give" and dove or fell out of the seat to the ground. (Complaint; Ex.B Cohen Depo. at T/23; Ex.B Cohen PC Affid).

Baker states that when he fell from the seat the contact with the taser probes was broken. (Complaint). Cohen's Deposition testimony indicates that at this point, when Baker was on the ground, he [Cohen] instructed Baker to get down from his knees to

a prone position, but he ignored the command. (Cohen Depo. T/23-25, at DE#38 pp.35-37, and at Ex.B, DE#35-1 p.19). Baker kept trying to get up, and was ignoring Cohen's repeated commands to comply with his orders. As Cohen went to discharge his Taser again, to force Baker into compliance, Baker grabbed the wires from the first Taser discharge [the one earlier deployed while he was seated in the truck] and tore at them, so that Cohen lost contact between that first set of Taser probes and his Electronic Control Device. As a result, Cohen shot at Baker again, discharging a second set of Taser probes, one of which hit Baker in the right hip. Baker then ripped the Taser lines from the second set of probes, jumped up, and got into the vehicle, the engine of which was still running, dropped it into drive, and took off in it. (T/24-25, at DE#38 pp.36-37; and Ex.B Cohen PC Affid).

The record shows that the events involving Cohen and plaintiff Baker were transpiring quickly, and that Lt. Cedeno, who responded after Cohen's initial traffic stop of Baker's truck, approached Baker's vehicle on the passenger side. Cedeno was primarily on the passenger side of the vehicle interacting with and giving commands to the passenger (the prostitute, Ms. Craig), whom he considered a potential second threat, in order to control her, while on the other side of the truck Baker was resisting Cohen, and Cohen was attempting to control Baker. During his interactions with her, Cedeno ordered the passenger Craig to get out of the vehicle and sit on the ground. Cedeno, intending to assist Cohen, moved toward the rear of the vehicle so he could get to the driver's side, having perceived that Baker and Cohen were struggling; and Cedeno radioed for backup. The struggle between Cohen and Baker had escalated, but Cedeno saw that Cohen had managed to put some distance between himself and Baker, and engaged him with a taser. Cohen moved back toward the front passenger door, in an attempt to reach in from the passenger side to get the ignition keys, but Baker had broken free of Cohen's control, managed to get in the

17

driver's seat; and Cedeno, while pointing his gun at Baker, ordered
him to turn off the vehicle. Baker ignored the command, stomped on
the gas, and drove away. (Cedeno Depo, DE#35-1, Ex.D at T/5-9, 12,
and DE#38 at pp.54-55, T/10, 12; Cedeno Trial testimony, T/342-43,
345, at DE#38 pp. 57-59; Cedeno police report at DE#35-1 Ex.D).

The record shows that a supplemental broadcast was transmitted
over the police radio, to which Sgt. Katz responded, indicating
that Cohen and Cedeno were having trouble with a suspect, and there
had been a battery on an officer (Ex.E, Katz Depo, T/4-5). Cedeno's
police report indicates that when the physical altercation between
Cohen and Baker ensued, he had called dispatch and asked that
backup units respond. (Ex.D, Cedeno Report). Katz, monitoring the
radio frequency heard urgency and panic in the officer's voice.
(Ex.E, Katz Depo. T/5). Katz acknowledged that he was on the way to
the initial scene in response to the call that there had been a
battery on an officer (Ex.E, T/5). Katz heard, however, apparently
from Cohen, that the truck was fleeing. (Ex.E, T/5). Katz put on
his lights and siren so he could respond quickly. It was about 3
a.m., and the traffic was sparse. Katz observed a truck going lane
to lane, changing lanes continuously when it encountered cars on
the road. The driver never hit his brakes, and he went through
about 25-30 intersections, perhaps 5 of which had red lights, at
times leading Katz at speeds in excess of 100 mph. Katz momentarily
lost sight of the truck, and Katz then heard another deputy over
the radio saying the truck had crashed and flipped (Ex.E, T/8-10).

Initially, Cedeno stayed with the female passenger at the
scene where Baker's truck first was stopped (Ex.D, Cedeno Depo. at
T/16).  When Lt. Haywood arrived at the scene of the initial stop
he remained there with Baker's female passenger. (Ex.D., Cedeno
police report). Cedeno then responded to the scene of Baker's
vehicle crash [from which Baker had fled on foot, and hid in a car
from which he later was removed with K-9 assistance]. (Cedeno

Depo., T/16). Cedeno did not arrive at that third location, while Baker was hiding in the car and was being removed from it (Ex.D, Cedeno Depo. at T/16; Cedeno Report).

   **2.  Use of K-9 Force at the Scene of Baker's Final Apprehension**

      As previously noted, the plaintiff, in his sworn complaint, alleges that Cohen and Sprouse located him, and that without warning they opened the car door and let the police dog maul him until paramedics appeared. (Complaint).

      It is undisputed that upon Baker's vehicular flight from the scene of the traffic stop he crashed and rolled his truck, and that he then fled on foot and hid on the floor of an unlocked car.

      The record shows that K-9 Officer Sprouse responded, and with use of his police dog began searching for the suspect [Baker]. Sprouse was advised of the suspect's description. Sprouse also was advised that the suspect had not been searched, and therefore he did not know if he was armed when he fled the initial scene. (Ex.F, Sprouse Canine Incident Report; Ex.G, Sprouse Police Report).

      Sprouse's Deposition testimony indicates that Cohen was present and met with him prior to his (Sprouse's) deployment of his K-9. Cohen told Sprouse he had tried to place the suspect under arrest, that he resisted and was Tased, that he continued to resist, and that the suspect eventually crashed his vehicle. (Ex.G, T/11). Cohen's deposition indicates he was present at the time and place that Sprouse released his K-9. (DE#35-1, Ex.B, Cohen Depo. T/35).

      Details about the place of apprehension, and deployment and call off of the police dog, are provided in K-9 Officer Sprouse's deposition. (Ex.G). Other details are provided by a page from Cohen's deposition (Ex.B). A perimeter was set up. Sprouse's dog, by scent, located the suspect who was hiding in a car. (Ex.G, T/5).

Sprouse's K-9 Report (DE#35-1, Ex.F) indicates that after the truck crash, he [Sprouse] initiated the ground search. He first gave a standard K-9 warning and heard no response. He then commanded the dog, which was still on a "lead" (leash), to commence its search by scent. When the dog followed a track, and alerted on the car, Sprouse saw that the car's windows were tinted; and before giving a final K-9 warning and releasing the dog into the car, Sprouse first attempted to look into the vehicle with aid of a flashlight. (Report, Ex.F).

Although plaintiff has alleged that he heard no warning, the record indicates that than at the car, where Baker was hiding, a K-9 warning was given by Sprouse, with no response from the suspect. (Ex.G, Sprouse Depo at T/8; Ex.B, Cohen Depo at T/35). The suspect had never been patted down, so, although Cohen hadn't earlier seen the suspect [Baker] in possession of a weapon, Cohen [and Sprouse] at the scene of apprehension with K-9 assistance didn't know if he was or was not armed. (Ex.B, Cohen Depo at T/35). Sprouse opened the car door. (Ex.B, Cohen Depo at T/35; Ex.G, Sprouse Depo at T/8). Sprouse then gave a final K-9 dog alert, stating "Police K-9. You're under arrest. Come out of the vehicle." (Ex.B, Cohen Depo at T/35; Ex.G, Sprouse Depo at T/8). The suspect just laid there, partially exposed, under clothing. The suspect ignored the command to come out, and Sprouse then deployed the dog. (Ex.B, Cohen Depo T/35; Ex.G, Sprouse Depo at T/8). As indicated in K-9 Officer Sprouse's deposition transcript (Ex.G), it was dark and the man was partially covered with clothing. It appeared to Sprouse that the dog first seized the suspect's leg. The man "started kicking and raising up." Sprouse at that point couldn't see his hands. Eventually the dog was able to get a hold onto the suspect's lower leg, and pull him out of the car. At that point, the man was still fighting with the dog, trying to grab the animal's muzzle [mouth], and was yelling. Sprouse asked another officer to attempt to secure the suspect's hands, and as soon as his hands were secured Sprouse

"removed the dog from the bite." The suspect was then transported [by fire rescue] and pursuant to policy Sprouse went to the hospital and did his required reports. (Defendants' Ex.G, Sprouse Depo at T/8-9). Sprouse's K-9 report echos these statements reflected in the excerpts of his deposition which are of record.

Sprouse's unsworn Canine Report (Ex.F) and Police Report (at Ex.G) both indicate that it was Ft. Lauderdale Fire Rescue which transported Baker to Broward General Medical Center for treatment. They state that as a result of the canine apprehension the suspect [Baker] sustained minor punctures to both lower legs, minor punctures to the left ankle and foot, a small laceration on the right lower leg and a puncture on the right thumb. [They further indicate that the suspect had a small cut on his head, minor cuts on both hands and possible internal injuries sustained from the car accident he was in prior to fleeing on foot]. (Ex.F; Ex.G).

Neither the plaintiff nor defendants offered as evidence in this case any medical records or affidavits from treating medical personnel attesting to the nature, extent, and causes of Baker's wounds/injuries.

### C. Analysis

#### 1. Bases for the Initial Stop, and for Baker's Subsequent Arrest

Despite the facts that there was no specific claim of false arrest articulated in the complaint, and that the pleading at initial screening was not construed to incorporate such a claim, it appears appropriate to discuss the questions of reasonableness of the initial stop of Baker's truck, and basis for subsequent attempts to arrest him, before turning to analysis of the reasonableness of the force which was used by Cohen in an attempt to effect Bakers' arrest at the scene of the initial traffic stop.

While the Fourth Amendment protects persons from unreasonable searches and seizures, it is apparent in this case, based on aforementioned evidence concerning Baker's driving behavior, that it was reasonable for Deputy Cohen to make the initial traffic stop, and address the driver Baker and request identification and insurance papers. <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996)("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"). <u>See</u> <u>Esteen v. State</u>, 503 So.2d 356 (Fla. 5th DCA 1987)(weaving within lane and driving slower than posted speed justified stop based on reasonable suspicion of impairment, unfitness or vehicle defects, even absent a traffic violation); <u>Roberts v. State</u>, 732 So.2d 1127, 1128 (Fla. 4th DCA 1999) (weaving several times within a single lane held sufficient to justify a stop where there was no evidence to show endangerment to others and where no traffic violation had occurred).

Thereafter, the length of Baker's detention was properly extended, when, as shown by the evidence discussed above, a BOLO indicated that a criminal offense had been committed at the Walgreens store, and Deputy Cohen had reason to believe that Baker's truck had been involved. <u>See</u> <u>United States v. Pruitt</u>, 174 F.3d 1215, 1220 (11 Cir.1999) (During a traffic stop, the officer may lengthen the detention for further questioning beyond that related to the initial stop when: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter); <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (when determining whether reasonable suspicion exists, the courts must review the "totality of the circumstances" to ascertain whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing).

Probable cause to make an arrest exists where the facts and circumstances within collective knowledge of law enforcement officials, of which the officers had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that the suspect had committed or was committing a crime. Carroll v. United States, 267 U.S. 132 (1925); Brinegar v. United States, 338 U.S. 160, 175-76 (1949)); Beck v. Ohio, supra, 379 U.S. at 91; Marx v. Gumbinner, 950 F.2d 1503, 1505-06 (11 Cir. 1990); Von Stein v. Brescher, 904 F.2d 572, 578 (11 Cir. 1990); Wilson v. Attaway, 757 F.2d 1227, 1235 (11 Cir. 1985); United States v. Middleton, 599 F.2d 1349, 1356 (5 Cir. 1979). The quantum of proof to establish probable cause is, therefore, significantly less than evidence sufficient to obtain a conviction. United States v. Pantojo-Soto, 739 F.2d 1520 (11 Cir. 1984), cert. denied, 470 U.S. 1008 (1985). In this case, un-refuted evidence shows that, after the BOLO giving the suspect's description and a licence plate number, Deputy Cohen had reason to belief Baker was involved in the criminal offense reported on his radio, and under those circumstances would have at least arguable probable cause to arrest. Then, after Baker had resisted and struggled with Deputy Cohen, and had struck him during Cohen's constitutionally valid attempt to detain him, on those facts, when coupled with the information indicating to Cohen that Baker was likely involved in the Walgreens theft, it is apparent that Cohen at that point had additional probable cause for an arrest, based on Baker's resistance, and perceived attempt to flee. There was yet further cause for arrest when Baker fled from Cohen's attempts to restrain and arrest him, and then led police on a highspeed chase, crashed his truck, and again fled on foot and hid in an attempt to avoid arrest. Thus, it is clear that there was ample probable cause for Baker's arrest, on grounds in addition to the theft of cartons of cigarettes from the Walgreens store, from which all subsequent events evolved.

In sum, it is apparent that Baker could not prevail on a claim of an improper initial traffic stop, or on a claim of arrest without probable cause in violation of the Fourth Amendment.

## 2.   Uses of Force at the Scene of the Traffic Stop

From the evidence of record, which is consistent with facts alleged in the complaint, but which fills in details omitted by the plaintiff, it is readily apparent under the circumstances discussed at length above, which were faced by Officer Cohen at the scene of the traffic stop, that the uses of force which he applied in an attempt to arrest plaintiff Baker were measured, and reasonable. The record shows that based on the BOLO, and what he personally had observed (that the truck he saw pull out of Walgreens had a driver and license tag consistent with the vehicle reported to have been driven by the man who robbed the store) Cohen had a reason to believe that Baker had committed a crime, albeit a theft, and when Baker got back into the truck it was not unreasonable for Cohen to grab him by the neck and arm to extract him from the vehicle to prevent him from fleeing. Given the un-refuted evidence of record (described in detail above) that Baker physically resisted Cohen's initial attempts to restrain him both on the ground and standing, striking Cohen in the process, engaging in a struggle during which Cohen perceived that Baker attempted to reach for and get control of his weapon; and given the fact that Baker was able to re-enter his truck, and engage the ignition, it is also apparent that the initial discharge of the Taser by Cohen when Baker was in the cab of the truck, was reasonable under the circumstances. That use of Taser force was resorted to only after Baker had physically resisted an attempt to restrain him, and Cohen perceived that Baker was attempting to flee. Cohen's first use of the taser was not unlike that in Draper v. Reynolds, supra, which was held to be constitutionally reasonable. So too was the second use of the Taser by Cohen reasonable under the circumstances which are shown to have

24

occurred by the un-refuted evidence of record, when Baker continued to refuse orders to get prone on the ground. Both uses of the Taser in this case are a far cry from the use of force in Stephens v. City of Butler, Alabama, supra (discussed in footnote 4 of this Report), in which there were no less than 5 trigger pulls on Taser devices by two different officers where the facts in that case showed the arrestee was making no effort to escape, made no threatening movements toward officers, and was surrounded by officers.

In sum, it is apparent that the uses of force by Deputy Cohen at the scene of the traffic stop were measured, and that Cohen attempted to first restrain Baker with manual force by pulling him from the truck. Only after Deputy Cohen met escalating resistence and force against him by the suspect/arrestee, did Cohen resort to a Taser; and that device was used twice only after Baker had continued his attempts to escape. Given these facts, notwithstanding Baker's attempt through his complaint/allegations to attribute some of his injuries to Cohen's uses of force [an allegation which he has not substantiated with medical records or other documents of the sort contemplated under Rule 56 as competent evidence for refuting a motion for summary judgment], it is apparent that Cohens' uses of force were not excessive under the circumstances, and did not amount to a violation of Baker's constitutional rights under the Fourth Amendment. Where force applied was reasonable under the circumstances and not excessive, the police officer has not violated any clearly established constitutional right, and is entitled to summary judgment based upon qualified immunity. Moore v. Gwinnett County, 967 F.2d 1495, 1498 (11 Cir. 1992), cert. denied, 506 U.S.1081, (1993), quoting, Leslie v. Ingram, 786 F.2d 1533, 1536 (11 Cir. 1986). See also Graham v. Connor, supra; and Smith v. Mattox, supra, 127 F.3d at 1419.

Where it is apparent there was no constitutional violation by Deputy Cohen, then it follows that there was no constitutional duty on the part of Cohen's fellow officer, Lt. Cedeno, to intervene and prevent Cohen from using the force in question for which Baker has sued Cohen. The claim of failure by Lt. Cedeno to prevent Cohen's uses of force at the scene of the initial stop therefore fails.[8]

**3.  <u>Use of K-9 force at the Final Scene of Baker's Apprehension</u>**

It is undisputed that, when he was found hiding on the floor in the back of a car, officers could not see Baker's hands and did not know if he was armed. Plaintiff Baker's actions, which were known to Cohen and K-9 Officer Sprouse, included his repeated prior attempts to flee the scene of the initial stop and arrest, his engagement in a highspeed chase ending in a crash, and his continued flight on foot. It is clear that a reasonable officer, under the circumstances, would believe that the suspect was dangerous, and posed a risk of harm to officers who were present, and to the public if he were again to flee from his place of hiding.

Balancing Baker's Fourth Amendment rights with the police officers' need to intrude upon those rights by using force to apprehend him, when considering the factors enunciated by the Supreme Court in <u>Graham v. Connor</u> it is apparent under the facts and circumstances faced by K-9 Officer Sprouse [and by Deputy Cohen who, although not himself a K-9 Officer, was present] that a

---

[8]     Moreover, under the circumstances, as the events unfolded, Cedeno was not in a position to intervene to either assist Cohen, or prevent Cohen's actions even if it had been appropriate for him to do so.

        It is apparent from the record, including testimony of Cedeno and Cohen, as well as the statement by the witness Ms. Craig, that the events were evolving quickly, that Cedeno was principally on the passenger side of the truck involved in dealing with the passenger Craig, and radioing for backup. When Cedeno then proceeded to the rear of the truck in an attempt to give Cohen assistance, he did not reach or touch Baker. Cohen had used his Taser, and when Baker broke free of the Taser probes and ran to the driver's door and jumped in the truck to flee, Cedeno turned and ran to the front passenger door in an attempt grab the keys. As Cedeno pointed his gun at Baker, and told him to turn off the ignition, Baker pressed on the accelerator and fled in the truck.

reasonable officer would have believed that use of K-9 force was necessary and appropriate to apprehend and subdue Baker. Therefore, it is amply clear, even when taking the facts in the light most favorable to the non-movant Baker, that at least an initial release of Sprouse's dog to bite, seize, hold, and if possible remove a him from the vehicle, was not a violation of Baker's constitutional rights under the Fourth Amendment. See: Kerr v. City of West Palm Beach, 875 F.2d 1546, 1553 (11 Cir. 1989) (holding that to the extent that a West Palm Beach Police Department policy authorized officers to use canine force against suspects who posed a threat to an arresting officer or to the community, the policy was clearly constitutional under the dictates of Tennessee v. Garner, 471 U.S. 1 (1985)); Chew v. Gates, 744 F.Supp. 952 (C.D.Cal. 1990). As for the initial release of Sprouse's dog into the car, it is therefore apparent that K-9 Officer Sprouse is entitled to qualified immunity.  On this claim, Deputy Cohen, who was present, and is sued for failing to intervene, also is entitled to qualified immunity, since he would have no duty to intervene to prevent an initial use of K-9 force which was itself not unconstitutional. For reasons discussed below, this conclusion is not disturbed by what appears to be an issue of fact regarding whether Sprouse did or did not gave plaintiff Baker a K-9 warning before releasing his dog into the car to seize/bite, hold and remove him. [In their respective depositions Cohen (Ex.B, T/35) and Sprouse (Ex.F, T/8) say a warning was given and ignored. Plaintiff Baker in his sworn complaint contends that "Deputy Steve Sprouse his police dog and Deputy Cohen located me without any warning Deputy Sprouse and Deputy Cohen opened the door and let the dog maul me until paramedics appeared." (Complaint, p.4A, at Ex.1, p.5 of 8]. This discrepancy of fact does not strip Sprouse and Cohen of any entitlement to qualified immunity they may have for deploying the K-9 in the interests of safety. Although there existed case law from the Fourth Circuit denying summary judgment to officers who gave no warning before releasing a K-9, see Vathekan v. Prince

27

George's County, 154 F.3d 173, 178-79 (4 Cir. 1998) (reversing a summary judgment ruling for police officer who deployed a police dog without a verbal warning), in this case the plaintiff Baker has failed to cite, and computer assisted research has failed to reveal the existence of any authority binding in this Circuit (a decision from the Eleventh Circuit, the U.S. Supreme Court, or the highest Court of Florida) holding and thereby clearly establishing that at the time of Baker's 2/7/2007 arrest a prior warning before release of a K-9 police dog was necessary, so as to put officers on notice of that requirement.[9] Thus, even if, assuming *arguendo*, Sprouse did not give a warning before releasing his dog to bite Baker, the failure to give such a warning would not strip Sprouse [and Cohen who was present] of entitlement to summary judgment and qualified immunity. See Trammell v. Thomason, No. 08-13801, 2009 WL 1706591, at *4-7, 335 Fed.Appx. 835, 840-43 (11 Cir. June 18, 2009) (case involving use of K-9 force on July 11, 2003, holding that despite an issue of fact regarding whether a K-9 warning was given on that date, the law was not clearly established either in 2003 or at the time of the 2009 opinion, that such a warning before release of a K-9 was required under the law of this Circuit). In reaching that conclusion, the Trammell Court acknowledged existence of the Vathekan decision from the Fourth Circuit, but noted "we have found no case from our Court, the Supreme Court of the United States, or the Supreme Court of Florida which so holds." Trammell, supra, at 2009 WL 1706591, at *6, 335 Fed.Appx. at 842.

There remains, however, a separate question regarding the continued use of K-9 force in Baker's case [i.e., whether Sprouse's dog should have been called off sooner than it was]. This claim arises from Baker's one-sentence allegation that "Deputy Sprouse

---

[9]    "[I]n this Circuit, the law can be 'clearly established' for [official] immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." See Wilson v. Strong, 156 F.3d 1131, 1135 (11th Cir.1998) (quoting Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n. 4 (11th Cir.1997)).

and Deputy Cohen...let the police dog maul me until paramedics appeared." (Complaint, p.4A, DE#1 at p. 5 of 8). At initial screening, based on this allegation, along with Baker's claim that he was bitten more than 50 times (Id.), the complaint being construed liberally, was deemed to include a claim that the police dog was allowed to unnecessarily continue biting Baker. In this regard, the Preliminary Report stated in pertinent part, as follows, *verbatim*:

> Liberally construed, [Baker] also alleges that... Cohen and Sprouse may have allowed a police dog to either unnecessarily attack him or let the dog continue to attack him after he may have been sub-dued. The claim that the dog bit him 50 times is a fact that supports a claim that the officers may have permitted the dog to attack him long after it was necessary for his capture. A determination of whether these defendants might be entitled to qual-ified immunity cannot be determined at this junc-ture or upon consideration of a motion to dismiss.

(Preliminary Report, DE#7, p.6). While, at summary judgment, a complaint and the evidence are to be construed in a light most favorable to a plaintiff/non-movant, it does not generally follow that a plaintiff, even one who is proceeding *pro se*, may simply rely on the allegations of his complaint to refute summary judg-ment. Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir. 1987). "A mere 'scintilla' of evidence is not enough. The non-movant must make a sufficient showing that "a jury could reasonably find for that party." Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 249-50; Walker v. Darby, supra, 911 F.2d at 1577. The mov-ant, of course, in the first instance, must have made a sufficient showing by identifying those portions of the record that demon-strate that there is no issue of material fact. Celotex Corp. v. Catrett, supra; Hoffman v. Allied Corp., supra, 912 F.2d at 1382.

Case law from this Circuit relating to use of K-9 force stands for the following propositions. As discussed above, use of K-9 force, even absent a prior warning before release of the dog, does not, without more, constitute a violation of the bitten suspect's constitutional rights when officers perceive that there exists a risk of harm to them or the public, justifying use of a K-9 to apprehend and hold the suspect. See Kerr and Trammell, supra. As noted by the Eleventh Circuit in Trammell, however, that Court's opinion in Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir.2000) "establishes that under certain circumstances failure to intervene in a dog attack is an obvious use of excessive force." Trammell, supra, 2009 WL 1706591 at *8, 335 Fed.Appx. at 843. In Trammell, the Court making that statement about its earlier holding in Priester, noted that "[a]s in Priester, Trammell insists that [the K-9 officer] permitted his dog to engage in an attack after it became apparent that he was not the suspect and posed no apparent danger to the officers." In Priester, the Eleventh Circuit denied qualified immunity to an officer who let a K-9 attack a suspect for a period of two minutes, during which it was clear that the suspect did not pose a threat of bodily injury to the officer and the suspect was not attempting to flee or resist arrest. See Priester, supra, 2008 F.3d at 927.

It is observed that the Eleventh Circuit, in Kerr, noted the following regarding "bite and hold" method of training police dogs.

> Under the bite and hold method of training, a dog seeks to subdue a suspect by biting his arm or leg; if, however, the dog has no access to such an appendage, the dog will bite the suspect on any available area of his body. Upon being bitten by a dog, a suspect usually attempts to free himself; the dog, however, is trained to maintain his hold on the suspect until ordered to release the suspect by its handler. Thus, if the dog should lose his hold as a result of the suspect's attempts to free

himself, the dog will seek to reestablish it. As a result, suspects often suffer serious injury from multiple bites received during the course of an apprehension.

The severity of an apprehended suspect's injuries can be reduced if the handler has complete control over the actions of his dog. With such control, the handler can recall or restrain the dog before a bite even occurs. Alternately, the handler can quickly remove the dog from the apprehended suspect, minimizing the possibility that the suspect will be further injured in an ensuing struggle.

Kerr, supra, 875 F.2d at 1550.

On the issue presently before the Court in this case, based on the record it appears there are issues of material fact, the existence of which precludes summary disposition (see Celotex, supra) on the issue of whether the K-9 in this case should have been called off earlier than it was, and whether plaintiff Baker sustained injuries as a result of failure to remove the dog sooner.

There stands a marked contrast between Baker's sworn allegation that he sustained more than 50 dog bites, some very severe, and Sprouse's unsworn reports suggesting less numerous K-9 injuries described largely as "minor." The defendants argue that there is no record evidence to support plaintiff's allegation that he was bitten as extensively as alleged, or for that matter that he suffered long term injuries. As noted previously, however, neither side in this case saw fit to present medical evidence, either the plaintiff to establish that he was bitten 50 or more times, or the defendants to support their claim that the use of force was reasonable under the circumstances, and that they are entitled to

qualified immunity.[10]  Under the circumstances, the plaintiff's sworn statement in his complaint, that he did sustain in excess of 50 dog bites, some serious, must be taken as true, may be considered at summary judgment, and in the absence of evidence to the contrary suffices at summary judgment to indicate that he did suffer the dog bite injuries which he claims to have sustained. Perry v. Thompson, and Sammons v. Taylor, supra.

The defendants, among excerpts from Sprouse's deposition, have offered the two-pages discussed previously (Ex.G, Depo T/8-9), which indicate that Baker struggled against the dog while inside the car, and that once the dog dragged Baker from the car by pulling on his leg, and had Baker on the ground, Baker continued to struggle ("was still fighting with the dog, trying to grab his muzzle and kicking and yelling"). Sprouse testified that he asked another officer to secure Baker's hands, and that "as soon as his hands were secured, I removed the dog from the bite."

The plaintiff's complaint also includes his statement made under penalty of perjury, that the officers allowed the dog to continue mauling him until paramedics arrived on the scene.

The Court does not doubt that if Baker had simply remained quiet and had not moved after he was initially bitten by the dog inside the car, and had not resisted the dog both before and after he was dragged from his hiding place, his injuries might have been less serious. See Kerr v. City of West Palm Beach, supra ("Upon being bitten by a dog, a suspect usually attempts to free himself; the dog, however, is trained to maintain his hold on the suspect until ordered to release the suspect by its handler. Thus, if the

---

[10]   In a case such as this, such evidence might ordinarily consist of photographs of the bitten individual's injuries, or reports and records and/or affidavits or declarations from paramedics who may have treated him at the scene of his apprehension or from treating medical personnel at the hospital.

dog should lose his hold as a result of the suspect's attempts to free himself, the dog will seek to reestablish it. As a result, suspects often suffer serious injury from multiple bites received during the course of an apprehension"). In this case, it cannot be determined what injuries were sustained while Baker was hiding in the car, and which ones occurred in front of the police officers after he had been dragged out of the car by the dog.

It is noted that while the defendants' unsworn and unauthenticated police and canine reports indicated that when plaintiff Baker was still inside the car he was given orders to "stop resisting and surrender" and ignored such orders, there is no indication that any such command was given once the plaintiff had been physically dragged from the car by the dog (i.e., there is no evidence that any officer told Baker once he was on the ground in front of them, being held by the police dog, that if he stopped resisting and submitted to handcuffing, the dog would be called off).

The Court cannot determine from the record over what duration of time the use of K-9 force lasted, in particular the use of force which occurred once the plaintiff Kerr had been pulled by the dog onto the ground, in plain view of officers who were present at the scene. Nor can the Court determine from pages 8-9 of Sprouse's deposition transcript, or elsewhere, when the paramedics arrived.

At this juncture, construing the evidence in the light most favorable to the non-movant/plaintiff, his statement that police allowed the dog to continue biting him until the time that paramedics arrived, must be treated as true. His undisputed allegation that he sustained no less than 50 dog bites, must at this juncture also be accepted as true, and that sworn allegation suggests the period of time when biting occurred may have been lengthy.

33

The record also indicates that the vehicle from which Baker was pulled was surrounded by officers other than Sprouse and Cohen. The officers presumably were armed. Sprouse has stated that once the plaintiff Baker was pulled from the car, he was using his hands to grab at the dog's muzzle, in an attempt to remove the dog, and therefore Baker presumably had his hands in plain sight and could be seen to not have a weapon in them.  At that point in time, the plaintiff, who was surrounded by armed police, and had no running vehicle at his disposal, presumably did not pose a realistic risk of flight, or serious risk of harm to the officers.  This raises the question whether Sprouse could at that point have commanded his dog to stop biting Baker, and instead switched to manual use of force to place Baker in handcuffs, at gun point if necessary, so as to minimize the risk of further serious injury to the already injured suspect, as suggested by the Eleventh Circuit's opinion in Kerr v. City of West Palm Beach, supra ("The severity of an apprehended suspect's injuries can be reduced if the handler has complete control over the actions of his dog...[and] the handler can quickly remove the dog from the apprehended suspect, minimizing the possibility that the suspect will be further injured in an ensuing struggle"). *Cf* Trammell and Priester, supra.

In sum, in light of issues of material fact in dispute, regarding the duration of the use of canine force both in the car and once the plaintiff was out of the car in the open with his hands in plain view, regarding when paramedics arrived on the scene, and regarding the nature and extent of the plaintiff's injuries, and their causes and when they occurred, it appears that: summary judgment based on qualified immunity, should be denied to K-9 Officer Sprouse, on the claim that once the plaintiff was outside of the car in which he hid, Sprouse should have called off his dog to minimize injury to Baker. Similarly, in light of the existing issues of material fact, and in light of evidence indicating that Deputy Cohen was present during and participated in the entirety of

34

the use of K-9 force [from commanding the dog to track Baker's scent, to the release of the dog to bite and hold him], it appears that summary judgment based on qualified immunity should be denied to Cohen on the claim that he failed to intervene when his co-officer Sprouse allegedly let the dog continue to bite Baker after the dog could have been called off once Baker was on the ground outside of the car in plain view of officers on the scene.

### III   CONCLUSION

It is therefore recommended that: (1) the joint motion for summary judgment by defendants Cohen, Cedeno, and Sprouse (DE#35), should be granted with respect to all claims and defendants, <u>with exception</u> of: the claim of alleged excessive force by K-9 Officer Sprouse once plaintiff Baker was extracted from the car in which he hid, and the claim against Deputy Cohen for failure to intervene and prevent that use of allegedly excessive K-9 force by Sprouse; and (2) the case remain pending solely against Sprouse and Cohen, limited to the claim of Sprouse's alleged use of excessive K-9 force once plaintiff Baker was removed from his place of hiding, and the claim of Cohen's alleged failure to intervene to prevent that use of force by Sprouse.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated: August 4th, 2010.

UNITED STATES MAGISTRATE JUDGE

cc:  Dennis V. Baker, <u>Pro Se</u>
     DC# 829470
     Century Correctional Institution
     400 Tedder Road
     Century, FL 32535-3655

Richard Thomas Wolfe, Esquire
Bunnell, Woulfe, Kirschbaum,
  Keller,  McIntyre, and Gregorie P.A.
100 SE 3rd Avenue, Suite 900
Fort Lauderdale, FL 33394


The Honorable Adalberto Jordan
United States District Judge